*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————————

## UNITED STATES
Appellee/Cross-Appellant

**v.**

## Monifa J. STERLING, Lance Corporal
United States Marine Corps, Appellant/Cross-Appellee

### No. 15-0510 & No. 16-0223
Crim. App. No. 201400150

Argued April 27, 2016—Decided August 10, 2016

Military Judges: C. M. Greer and N. A. Martz

For Appellant/Cross-Appellee: *Paul D. Clement*, Esq. (argued); *Major John J. Stephens*, USMC, *Michael D. Berry*, Esq., *George W. Hicks Jr.*, Esq., and *Michael H. McGinley*, Esq. (on brief).

For Appellee/Cross-Appellant: *Brian K. Keller*, Esq. *(argued); Colonel Mark K. Jamison*, USMC (on brief).

Amici Curiae for Appellant/Cross-Appellee: *J. Mark Brewer*, Esq., *Michael Connelly,* Esq., *John S. Miles*, Esq., *Jeremiah L. Morgan*, Esq., *Robert J. Olson,* Esq., *William J. Olson,* Esq., and *Herbert W. Titus*, Esq. (on brief) – for Citizens United, Citizens United Foundation, U.S. Justice Foundation, Faith and Action, Public Advocate of the U.S., Inc., Conservative Legal Defense and Education Fund, Institute on the Constitution, E. Ray Moore, and George P. Byrum; *Ashley G. Chrysler*, Esq., *Conor B. Dugan*, Esq., and *Matthew T. Nelson*, Esq. (on brief) – for Nine Retired General Officers; *Daniel Briggs,* Esq. (on brief) – for Alliance Defending Freedom and Chaplain Alliance for Religious Liberty; *Eric Baxter*. Esq., and *Daniel Blomberg*, Esq. (on brief) – for Aleph Institute et al.; *Jocelyn Floyd*, Esq. (on brief) – for Rabbi Philip Lefkowitz; *Robert W. Ash*, Esq., *Laura B. Hernandez,* Esq., and *Jay Alan Sekulow*, Esq. (on brief) – for Members of Congress, The American Center for Law and Justice, and The Committee to Protect Religious Liberty in the Military; *E. Scott Pruitt*, Attorney General of Oklahoma, *Patrick R. Wyrick*, Solicitor General of Oklahoma, and *Mithun Mansinghani*, Deputy Solicitor General of Oklahoma (on petition) – for the State of Oklahoma.

Amici Curiae for Appellee/Cross-Appellant: *Bradley Girard*, Esq., and *Richard B. Katskee*, Esq. (on brief) – for Americans United for Separation of Church and State, Jewish Social Policy Action Network, and People for the American Way Foundation.

Amicus Curiae in Support of Neither Party: *E. Scott Pruitt*, Attorney General of Oklahoma, *Mithun Mansinghani*, Deputy Solicitor General of Oklahoma, *Adam Paul Laxalt*, Attorney General of Nevada, *Mark Brnovich*, Attorney General of Arizona, *Leslie Rutledge*, Attorney General of Arkansas, *Sam Olens*, Attorney General of Georgia, *Doug Peterson*, Attorney General of Nebraska, *Alan Wilson*, Attorney General of South Carolina, *Ken Paxton*, Attorney General of Texas, *Sean D. Reyes*, Attorney General of Utah, *Patrick Morrisey*, Attorney General of West Virginia (on brief) – for the States of Oklahoma, Nevada, Arizona, Arkansas, Georgia, Nebraska, South Carolina, Texas, Utah, and West Virginia; *Donald G. Rehkopf Jr.*, Esq. (on petition) – for The Military Religious Freedom Foundation.

Judge RYAN delivered the opinion of the Court, in which Chief Judge ERDMANN, Judge STUCKY, and Senior Judge COX, joined. Judge OHLSON filed a separate dissenting opinion.

───────────────

Judge RYAN delivered the opinion of the Court.

A special court-martial consisting of officer and enlisted members convicted Appellant, contrary to her pleas, of one specification of failing to go to her appointed place of duty, one specification of disrespect toward a superior commissioned officer, and four specifications of disobeying the lawful order of a noncommissioned officer (NCO), in violation of Articles 86, 89, and 91, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 889, 891 (2012). The members sentenced Appellant to a reduction to pay grade E-1 and a bad-conduct discharge. The convening authority approved the sentence as adjudged. The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) affirmed the findings and sentence. *United States v. Sterling,* No. NMCCA 201400150, 2015 CCA LEXIS 65, at *2, *30, 2015 WL 832587, at *1, *10 (N-M. Ct. Crim. App. Feb. 26, 2015) (unpublished).

The Religious Freedom Restoration Act (RFRA), 42 U.S.C. 2000bb-1 (2012) (as amended), which, by its own

terms, applies to every "branch, department agency, instrumentality, and official (or other person acting under color of law) of the United States," 42 U.S.C. § 2000bb-2(1), also applies in the military context. Indeed, at least two general orders prescribe the manner in which religious accommodations to rules of general applicability should be processed and facilitated in the military. Dep't of Defense Instr. 1300.17, Accommodation of Religious Practices Within the Military Services (Feb. 10, 2009, Incorporating Change 1, Jan. 22, 2014) [hereinafter DoDI 1300.17]; Dep't of the Navy, Secretary of the Navy Instr. 1730.8B CH-1, Accommodation of Religious Practices (Mar. 28, 2012) [hereinafter SECNAVINST 1730.8B CH-1]. But we note from the outset that this is not the usual case where an individual or group sought an accommodation for an exercise of religion and it was denied. Nor is it a case where the practice at issue was either patently religious, such as the wearing of a hijab, or one where it was not but a government actor somehow knew the practice was religious and prohibited it on that basis. Rather, the claimed exercise of religion at issue in this case involved posting the printed words "[n]o weapon formed against me shall prosper" at a shared workspace in the context of Appellant's contentious relationship with her superiors.

As the NMCCA concluded, Appellant did not inform the person who ordered her to remove the signs that they had had any religious significance to Appellant, the words in context could easily be seen as combative in tone, and the record reflects that their religious connotation was neither revealed nor raised until mid-trial. *See Sterling,* 2015 CCA LEXIS 65, at *11, *14–15, *19, 2015 WL 832587, at *4, *5, *6. Nor, despite the existence of procedures for seeking a religious accommodation, did Appellant seek one. *Sterling,* 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. Nonetheless, the following issues are before this Court:

## SPECIFIED ISSUES

I. DID APPELLANT ESTABLISH THAT HER CONDUCT IN DISPLAYING SIGNS REFERENCING BIBLICAL PASSAGES IN HER SHARED WORKPLACE CONSTITUTED AN EXERCISE OF RELIGION WITHIN THE MEANING OF THE RELIGIOUS FREEDOM RESTORATION ACT, 42 U.S.C. 2000bb-1 (2012), AS

3

AMENDED? IF SO, DID THE ACTIONS OF HER SUPERIOR NONCOMMISSIONED OFFICER IN ORDERING HER TO TAKE THE SIGNS DOWN, AND IN REMOVING THEM WHEN SHE DID NOT, CONSTITUTE A SUBSTANTIAL BURDEN ON APPELLANT'S EXERCISE OF RELIGION WITHIN THE MEANING OF THE ACT? IF SO, WERE THESE ACTIONS IN FURTHERANCE OF A COMPELLING GOVERNMENT INTEREST AND THE LEAST RESTRICTIVE MEANS OF FURTHERING THAT INTEREST?

II. DID APPELLANT'S SUPERIOR NONCOMMISSIONED OFFICER HAVE A VALID MILITARY PURPOSE IN ORDERING APPELLANT TO REMOVE SIGNS REFERENCING BIBLICAL PASSAGES FROM HER SHARED WORKPLACE?

## CERTIFIED ISSUES

I. DID APPELLANT'S FAILURE TO FOLLOW AN INSTRUCTION ON THE ACCOMMODATION OF RELIGIOUS PRACTICES IMPACT HER CLAIM FOR RELIEF UNDER THE RELIGIOUS FREEDOM RESTORATION ACT?

II. DID APPELLANT WAIVE OR FORFEIT HER RELIGIOUS FREEDOM RESTORATION ACT CLAIM OF ERROR BY FAILING TO RAISE IT AT TRIAL?

We hold that the orders to remove the signs were lawful. Appellant's claimed defense to violating those orders under RFRA was preserved, but Appellant has failed to establish a prima facie RFRA case. Moreover, we hold that her failure to either inform her command that the posting of the signs was religiously motivated or seek an accommodation are both relevant to Appellant's failure to establish that the orders to remove the signs constituted a substantial burden on her exercise of religion. Consequently, while the NMCCA's RFRA analysis was flawed, we affirm the decision on other grounds.

## I. FACTS

In December 2012, Appellant was assigned to Section-6 (S-6) of the 8th Communications Battalion. Staff Sergeant (SSgt) Alexander was her immediate supervisor. Appellant assisted Marines with their Common Access Cards. Marines sat next to Appellant's desk while she assisted them. The military judge found that, during this time, Appellant shared her desk with another junior Marine.

Appellant had ongoing difficulties and a contentious relationship with many superiors in her command, including SSgt Alexander. While Appellant characterized the difficulties as "people … picking on [her]," from the command's perspective, the difficulties were that:

> [Appellant] fails to provide a positive contribution to the unit or Corps. [Appellant] cannot be relied upon to perform the simplest of tasks without 24/7 supervision. [Appellant] has not shown the discipline, professional growth, bearing, maturity or leadership required to be a Marine. Ultimately [Appellant] takes up [the] majority of the Chain of Command's time dealing with her issues that result from nothing more than her failure to adapt to military life.

The charges at issue in this case are symptomatic of these deficiencies, and other performance issues, while not the subject of criminal charges, were noted in her service record book. In May 2013, two months after a counseling session for failing to secure a promotion, and on the heels of a confrontation with SSgt Alexander about turning in a completed Marine Corps Institute course, Appellant printed three copies of the words "[n]o weapon formed against me shall prosper," on 8 1/2- x 11-inch paper in 28-point font or smaller. Appellant cut the signs to size and taped one on the side of her computer tower, one above her computer screen, and one above her desk mailbox. The signs contained no additional information and were large enough for those walking by Appellant's desk and Marines seated at her workspace to read.

SSgt Alexander discovered the signs and ordered Appellant to remove them because "it wasn't just her desk; it was being shared by the other junior Marine." According to Appellant, SSgt Alexander said that she wanted the signs removed because she did not like their tone. Nothing in the

record indicates that SSgt Alexander knew that the text was Biblical in origin, and the NMCCA found that Appellant never informed SSgt Alexander that the signs had either a religious genesis or any religious significance to Appellant. *Sterling*, 2015 CCA LEXIS 65, at *11, *14–15, 2015 WL 832587, at *4, *5, *6.

Appellant failed to remove the signs, so SSgt Alexander removed them herself. The next day, SSgt Alexander saw that Appellant had replaced the signs and once more ordered Appellant to remove them. Appellant also failed to follow this order, and SSgt Alexander again removed the signs. In addition to failing to mention the religious nature of or religion practice involved to SSgt Alexander, Appellant also failed to request a religious accommodation to enable her to display the signs. *Sterling*, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5.

In August 2013, another of Appellant's superiors, SSgt Morris, noticed that Appellant was not wearing the proper uniform, and he ordered her to wear "her service uniforms as directed by the Commandant of the Marine Corps." According to SSgt Morris, Appellant refused to obey the order because Appellant said "she had a medical chit out there stating she could not wear the uniform." SSgt Morris spoke with medical personnel at the base, who stated that Appellant could wear the required uniform, and he again ordered Appellant to change into the proper uniform. Appellant refused. SSgt Morris then escorted Appellant to First Sergeant (1stSgt) Robinson, who repeated the order for a third time. Appellant again refused.

On September 12, 2013, 1stSgt Robinson ordered Appellant to report to the Pass and Identification building on Sunday, September 15, 2013, from 4:00 PM until approximately 7:30 PM, to help distribute vehicle passes to families of service members returning from deployment. According to 1stSgt Robinson, Appellant refused on the basis that "she was on medication." On September 13, 2013, 1stSgt Robinson informed Major (Maj) Flatley that he was having issues with Appellant. Maj Flatley met with Appellant to "talk some sense into her, reason with her, [and] to make sure that she goes to her appointed place of duty on Sunday." During their conversation, Maj Flatley attempted to hand the vehicle passes to Appellant. According to Maj Flatley, Appellant refused to take the passes and stated that she would not be there and would be sleeping. As a result, Maj

Flatley called 1stSgt LaRochelle and directed her to begin writing a charge sheet on Appellant.

Maj Flatley gave Appellant another chance to comply and again ordered Appellant to distribute passes on Sunday. Maj Flatley asked whether Appellant understood the order and would comply. According to Maj Flatley, Appellant said that she understood the order but was not going to be there, and instead was "going to take [her] meds and sleep and go to church." Maj Flatley explained to Appellant that distributing the passes did not conflict with church because the passes did not need to be distributed until 4:00 PM on Sunday. On September 15, 2013, Appellant did not report to her appointed place of duty.

A special court-martial for charges resulting from the above incidents commenced in January 2014. At trial, the military judge cautioned Appellant about the dangers of appearing pro se. Nonetheless, Appellant elected to represent herself, with limited assistance from defense counsel. As relevant to the issues before this Court, during the middle of trial and days after SSgt Alexander's initial direct trial testimony about Appellant's failure to obey her orders to remove the signs, Appellant moved to dismiss those orders violations.

Appellant argued for the first time that the orders to remove the signs were "unlawful under the grounds of [her] religion" and that the Department of Defense (DoD) permitted her to practice her religion "as long as it's within good order [and] discipline." Appellant indicated that she was a nondenominational Christian and that the quotations were "a [B]ible scripture" and "of a religious nature." Without argument or comment, Appellant also submitted DoDI 1300.17 (Jan. 22, 2014), which referenced RFRA and incorporated RFRA's language.[1] Appellant testified that because she was a religious person, she posted the signs in the form of the Christian Trinity to have the "protection of three" and to serve as a "mental note."

Appellant also testified that the signs were "just purely personal" and served as "a mental reminder to [her] when [she came] to work .... [because she did not] know why these

---

[1] Prior to and during trial, the Department of Defense updated DoDI 1300.17 (Jan. 22, 2014), providing greater reference to RFRA. Appellant submitted the new instruction. *See also* DoDI 1300.17 (Feb. 10, 2009) (in place at the time of conduct at issue).

people [were] picking on [her]." Appellant stated that she believed her situation with her command was unfair because she was being picked on, including by SSgt Alexander. The Government reasserted that the signs were ordered to be taken down because they were distracting.

The military judge held that SSgt Alexander's orders were lawful because they were "related to a specific military duty," SSgt Alexander was authorized to give them, and each order required Appellant to do something immediately or at a future time. Furthermore, the military judge held that the orders were reasonably necessary to safeguard military interests and good order and discipline because other servicemembers could have seen the signs in the shared workspace and the signs' language, "although ... [B]iblical in nature ... could easily be seen as contrary to good order and discipline." Finally, the military judge ruled that the orders to remove the signs "did not interfere with [Appellant's] private rights or personal affairs."

## II. NMCCA DECISION

On appeal, the NMCCA, held, inter alia, that SSgt Alexander's orders served a valid military purpose and were lawful. *Sterling*, 2015 CCA LEXIS 65, at \*19, 2015 WL 832587, at \*6. The NMCCA held that the orders maintained good order and discipline because (1) the signs could have fostered religious divisions in the military workplace[2] and (2) the signs expressed Appellant's antagonism toward her command. While the court noted that the military judge's factual findings were meager and "fail[ed] to illuminate why the military judge believed the signs['] verbiage 'could easily be seen as contrary to good order and discipline,'" the NMCCA nonetheless observed that the record adequately supported the military judge's conclusion that SSgt Alexander's orders were lawful. *Sterling*, 2015 CCA LEXIS 65, at \*16–17, 2015 WL 832587, at \*5.

---

[2] We reject this basis for concluding that the orders were lawful. While the military judge found that the signs were "[B]iblical in nature," that Appellant's desk was shared with another Marine, and that the signs were visible to Marines sitting at Appellant's desk, there is nothing in the record to establish that the signs were readily identifiable as religious quotations, and thus, the notion that they would foster religious divisions seems untenable. *Sterling*, 2015 CCA LEXIS 65, at \*17, 2015 WL 832587, at \*6.

Recognizing Appellant's bellicose relationship with her command, the NMCCA found that Appellant was "locked in an antagonistic relationship with her superiors," that the signs could be interpreted as combative, and agreed with the military judge that the signs could thus "easily be seen as contrary to good order and discipline." *Sterling*, 2015 CCA LEXIS 65, at *19, 2015 WL 832587, at *6 (internal quotation marks omitted).

The NMCCA then concluded that Appellant was not entitled to a defense to the orders violations based on RFRA. *Sterling*, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. The NMCCA held that the definition of religious exercise required "the practice be 'part of a system of religious belief.'" *Sterling*, 2015 CCA LEXIS 65, at *14, 2015 WL 832587, at *5. Reasoning from this premise, it went on to conclude that Appellant's posting of signs containing a Biblical quotation in three places around her workstation did not qualify as a religious exercise and that as a result, RFRA did not apply. *Sterling*, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. The court observed, "[w]hile [Appellant's] explanation at trial may invoke religion, there is no evidence that posting signs at her workstation was an 'exercise' of that religion in the sense that such action was 'part of a system of religious belief.'" *Sterling*, 2015 CCA LEXIS 65, at *15–16, 2015 WL 832587, at *5. Moreover, the court noted that Appellant never stated that the signs had a "religious connotation" and never requested any religious accommodation for them. *Sterling*, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. Rather, the court found that the record demonstrated that Appellant had placed the signs as "personal reminders that those she considered adversaries could not harm her." *Sterling*, 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5.

## III. DISCUSSION

### A. The Orders to Remove the Signs Were Lawful

"The legality of an order is a question of law that [this Court] review[s] de novo." *United States v. Moore*, 58 M.J. 466, 467 (C.A.A.F. 2003). This Court defers to a military judge's factual findings "unless they are clearly erroneous or unsupported by the record." *United States v. Rader*, 65 M.J. 30, 33 (C.A.A.F. 2007). The same deference applies to the NMCCA's factual findings. *United States v. Tollinchi*, 54 M.J. 80, 82 (C.A.A.F. 2000).

A lawful order "must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service." *Manual for Courts-Martial, United States* pt. IV, para. 14.c.(2)(a)(iv) (*MCM*). "[T]he dictates of a person's conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order." *MCM* pt. IV, para. 14.c.(2)(a)(iv). "An order is presumed to be lawful, and the accused bears the burden of rebutting the presumption." *United States v. Ranney*, 67 M.J. 297, 301–02 (C.A.A.F. 2009) (citation omitted) (internal quotation marks omitted), *overruled by United States v. Phillips*, 74 M.J. 20, 22–23 (C.A.A.F. 2015). "To be lawful, an order must (1) have a valid military purpose, and (2) be clear, specific, and narrowly drawn." *Moore*, 58 M.J. at 468 (citation omitted). "The order must not conflict with the statutory or constitutional rights of the person receiving the order." *MCM* pt. IV, para. 14.c.(2)(a)(v).

Appellant argues that there was no valid military purpose in ordering her to remove the signs from her shared work space. We disagree. The military judge's and NMCCA's findings that Marines sharing or coming to the workspace would be exposed to the signs are not clearly erroneous. *Sterling*, 2015 CCA LEXIS 65, at *17, 2015 WL 832587, at *6. SSgt Alexander was Appellant's immediate supervisor and testified that she wanted the signs removed because she wished to keep the shared workspace clean.

Importantly, the NMCCA's findings that Appellant had a "contentious" relationship with her command, "even prior" to this incident, and that, in that context, posting the words "[n]o weapon formed against me shall prosper" might be "interpreted as combative" are also not clearly erroneous. 2015 CCA LEXIS 65, at *19, 2015 WL 832587, at *6 (internal quotation marks omitted). Appellant herself conceded that SSgt Alexander did not like the signs' tone, and the NMCCA found that Appellant did not tell SSgt Alexander that the signs had a religious connotation. *Sterling,* 2015 CCA LEXIS 65, at *15, 2015 WL 832587, at *5. Given these circumstances and the complete absence of evidence that SSgt Alexander either knew the signs were Biblical or ordered them removed for that reason, Appellant has failed to rebut the presumption that the orders were lawful and necessary to further the mission of Appellant's unit by maintaining good order and discipline. Without question, a junior Marine with

10

a contentious relationship with her superiors posting combative signs in a workspace could undermine good order and discipline.

Appellant fails to rebut the presumption of the lawfulness of the orders, and because she fails to establish a prima facie RFRA case, she also lacks a defense for failing to follow the orders.

## B. RFRA[3]

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). As amended by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), "'exercise of religion'" is broadly defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2 (4) (cross-referencing "exercise of religion" as defined in RLUIPA, 42 U.S.C. § 2000cc-5(7)(A)). As we noted above, RFRA applies to the military. *See supra* p. 3.

"Our review of the requirements of [RFRA], although largely factual in nature, presents mixed questions of fact and law." *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996). This Court reviews legal questions, including the application of RFRA, de novo. *See United States v. McElhaney*, 54 M.J. 120, 125 (C.A.A.F. 2000). Factual findings are reviewed for clear error. *United States v. Gallagher*, 66 M.J. 250, 253 (C.A.A.F. 2008).

Appellant argues that the NMCCA erred in its rationale for declining to afford her a RFRA defense to the orders violations and that the order to remove the signs substantially burdened her sincerely held religious beliefs. In sum, we agree that the NMCCA erred in defining "religious exercise" for purposes of RFRA. But while the posting of signs was claimed to be religiously motivated at least in part and thus falls within RFRA's expansive definition of "religious exercise," Appellant has nonetheless failed to identify the sincerely held religious belief that made placing the signs im-

---

[3] Given Appellant's assertion at trial that the orders violated her religion, the submission of an order that cited RFRA, and the raising of the issue before the NMCCA, we reject the Government's argument that Appellant waived or forfeited her right to assert her RFRA claim on appeal to this Court. *Hankins v. Lyght*, 441 F.3d 96, 104 (2d Cir. 2006).

11

portant to her exercise of religion or how the removal of the signs substantially burdened her exercise of religion in some other way. We decline Appellant's invitation to conclude that any interference at all with a religiously motivated action constitutes a substantial burden, particularly where the claimant did not bother to either inform the government that the action was religious or seek an available accommodation.

### 1. Religious Exercise Under RFRA

A RFRA inquiry is triggered by a "religious exercise." The NMCCA's holding that RFRA's definition of "'religious exercise' requires the practice be 'part of a system of religious belief'" was too narrow.[4] *Sterling*, 2015 CCA LEXIS 65, at *14, 2015 WL 832587, at *5 (quoting 42 U.S.C. § 2000cc-5(7)(A)). RFRA defines "'religious exercise'" as "any exercise of religion, *whether or not compelled by, or central to, a system of religious belief*." 42 U.S.C. § 2000bb-2(4) (emphasis added) (cross-referencing 42 U.S.C. § 2000cc-5(7)(A)). A "'religious exercise'" under RFRA "involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2770 (2014) (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)).

On the one hand, there was no indication on the signs that the quote was Biblical, and there was no testimony that Appellant informed SSgt Alexander or anyone else that she posted the signs for religious purposes until trial. On the other hand, Appellant stated she was a "[n]ondenominational" Christian and that the signs "are a [B]ible scripture" of "a religious nature." Appellant also testified that the signs invoked the Trinity and fortified her against those who were picking on her. Appellant stated that she was motivated to post the signs in order to gain the "protection" of the "[T]rinity," because she is "a religious person." Given RFRA's broad definition of religious exercise, Appellant's posting of signs could qualify.

However, this does not answer the altogether different questions whether (1) the conduct was based on a sincerely

---

[4] It is entirely possible, given the remainder of its conclusions, that the NMCCA intended to hold that posting the signs was not based on a sincerely held religious belief. But that is not what it said.

held religious belief, as opposed to being a post-hoc justification for posting signs that were combative in nature and violating orders to remove them, or (2) the orders to remove the signs substantially burdened Appellant's religious beliefs.

## 2. Prima Facie RFRA Case

To establish a prima facie RFRA defense, an accused must show by a preponderance of the evidence that the government action (1) substantially burdens (2) a religious belief (3) that the defendant sincerely holds. *See*, *e.g.*, *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015); *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007); *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). If a claimant establishes a prima facie case, the burden shifts to the government to show that its actions were "the least restrictive means of furthering a compelling governmental interest." *United States v. Quaintance*, 608 F.3d 717, 719–20 (10th Cir. 2010). Because Appellant fails to establish a prima facie case, the burden does not shift to the Government in this case.

### a. Sincerely Held Religious Belief

While religious conduct triggers a RFRA inquiry, RFRA only protects actions that are "sincerely based on a religious belief." *See Holt*, 135 S. Ct. at 862. Determining sincerity is a factual inquiry within the trial court's authority and competence, *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013), and "the [claimant's] 'sincerity' in espousing that practice is largely a matter of individual credibility," *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013). Courts are highly deferential to claimants in evaluating sincerity, *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2012), but may still conduct meaningful reviews of sincerity. *See Hobby Lobby Stores*, 134 S. Ct. at 2774 n.28; *Quaintance*, 608 F.3d at 721–23; *United States v. Manneh*, 645 F. Supp. 2d 98, 112–13 (E.D.N.Y. 2008) (noting that courts are "seasoned appraisers of the 'motivations' of parties" and can observe the claimant's "demeanor during direct and cross-examination") (citation omitted) (internal quotation marks omitted); *Zimmerman*, 514 F.3d at 854 ("The district court should hear directly from [the claimant], as his credibility and demeanor will bear heavily on whether his beliefs are sincerely held."). "Neither the government nor the court has to accept the defendants' mere say-so." *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981) ("[A]n adherent's belief would

not be 'sincere' if he acts in a manner inconsistent with that belief … or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of a religious doctrine.") (internal citations omitted); *cf. United States v. Messinger*, 413 F.2d 927, 928–30 (2d Cir. 1969) (referencing a Justice Department recommendation that a defendant-draftee's "long delay in asserting his conscientious objector claim" was evidence of religious insincerity where his claim came two years after his Selective Service registration). To be certain, in evaluating sincerity a court may not question "whether the petitioner ... correctly perceived the commands of [his or her] faith." *Thomas v. Review Bd.,* 450 U.S. 707, 716 (1981). Nor does a court "differentiate among bona fide faiths." *See Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).

In this case, the record does not clearly address whether Appellant's conduct was based on a "sincerely held religious belief" or motivated by animosity toward her chain of command. While Appellant testified that the signs were religious, arranged to mimic the Trinity, and were "personal …. mental reminder[s]," she also only raised religion as an explanation for the signs in the middle of trial, and some of her testimony arguably indicates that the signs were actually a response to contentious relationships at work, including with SSgt Alexander. Moreover, the NMCCA's factual analysis, which is not clearly erroneous, emphasizes this nonreligious basis for the signs. *Cf. supra* pp. 9, 12 note 4.

Yet, whether her conduct was based on a sincerely held religious belief is an intensely fact-based inquiry, *see Korte*, 735 F.3d at 683, and is beyond the purview of this Court. *United States v. Crider*, 22 C.M.A. 108, 110–11, 46 C.M.R. 108, 110–11 (1973). We could simply hold that it was her burden to affirmatively establish the sincerity of her belief by a preponderance of the evidence at trial and that she failed to do so. *See Quaintance*, 608 F.3d at 719–23. However, because we can resolve the case on the basis of Appellant's failure to establish that the orders to remove the signs were a substantial burden, we will instead assume arguendo that her conduct was based on a sincerely held religious belief.

### b. Substantial Burden

Early drafts of RFRA prohibited the government from placing a "burden" on religious exercise, but Congress added the word "substantially" before passage to clarify that only some burdens would violate the act. 139 Cong. Rec. S14352

(daily ed. Oct. 26, 1993) (statements of Sen. Kennedy and Sen. Hatch). RFRA does not define "substantially burden," and the federal appellate courts provide several different formulations. Contrary to Appellant's argument, not every interference with conduct motivated by a sincere religious belief constitutes the substantial burden that RFRA prohibits.

To be sure, all courts agree that a substantial burden exists where a government action places "'substantial pressure on an adherent to modify [her] behavior and to violate [her] beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas,* 450 U.S. at 718); *cf. Sherbert v. Verner,* 374 U.S. 398, 403–04 (1963).[5] But no court interpreting RFRA has deemed that *any* interference with or limitation upon a religious conduct is a substantial interference with the exercise of religion. Instead, and contrary to the dissent's understanding, courts have focused on the subjective importance of the conduct to the person's religion, as well as on "whether the regulation at issue 'force[d claimants] to engage in conduct that their religion forbids or … prevents them from engaging in conduct their religion requires.'" *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (quoting *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C.

---

[5] However, aside from this point of agreement, there is not precise conformity within the federal circuits on the exact parameters of what constitutes a "substantial burden." *See, e.g.*, *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 332 (5th Cir. 2009) ("A burden is *substantial* if 'it truly pressures the adherent to significantly modify his religious behavior and *significantly violate* his religious beliefs.'") (citation omitted) (second emphasis added); *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007) ("For the purposes of RLUIPA, a substantial burden exists where … the government puts *substantial pressure* on an adherent to substantially modify his behavior and to violate his beliefs.") (emphasis added); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) ("The combined import of these articulations leads us to the conclusion that a 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to *significant pressure which directly coerces* the religious adherent to conform his or her behavior accordingly.") (emphasis added); *Ford v. McGinnis*, 352 F.3d 582, 593–94 (2d Cir. 2003) (framing inquiry as whether the belief interfered with by the government was "considered central or important to [petitioner's] practice of Islam."). The order to remove signs in the instant case does not constitute a substantial burden under any of these formulations.

Cir. 2001)). In other words, having restraints placed on behavior that is religiously motivated does not necessarily equate to either a pressure to violate one's religious beliefs or a substantial burden on one's exercise of religion. We agree with the D.C. Circuit that:

> One can conceive of many activities that are not central or even important to a religion, but nevertheless might be religiously motivated…. To make religious motivation the critical focus is, in our view, to read out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest requirement.

*Henderson*, 253 F.3d at 17.

Of course, to determine whether a prima facie case has been established, courts do not question "whether the petitioner … correctly perceived the commands of [his or her] faith." *Thomas*, 450 U.S. at 716. But while we will not assess the importance of a religious practice to a practitioner's exercise of religion or impose any type of centrality test, a claimant must at least demonstrate "an honest belief that the practice is important to [her] free exercise of religion" in order to show that a government action substantially burdens her religious exercise. *Sossamon*, 560 F.3d at 332; *see also Ford*, 352 at 593–94. A substantial burden is not measured only by the secular costs that government action imposes; the claimant must also establish that she believes there are religious costs as well, and this should be clear from the record. *See* Ira C. Lupu, *Hobby Lobby and the Dubious Enterprise of Religious Exemptions*, 38 Harv. J.L. & Gender 35, 80 (2015); *cf. Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010).

This requirement is not novel; language in central Supreme Court opinions on the question of substantial burden affirms that the adherent's subjective belief in the importance of a practice to her religion is relevant to the substantial burden inquiry. *See, e.g., Holt*, 135 S. Ct. at 862 ("Here, the religious exercise at issue is the growing of a beard, which petitioner believes is a dictate of his religious faith, and the Department does not dispute the sincerity of petitioner's belief…. Because the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise.") (internal citation omitted); *Hobby Lobby*, 134 S. Ct. at 2764–65, 2778 (noting that the claimants have a sincere religious belief that life begins at conception and "that

providing the coverage demanded by the HHS regulations is connected to the destruction of an embryo in a way" that goes "'against [their] moral conviction to be involved in the termination of human life'") (internal citations omitted); *Yoder*, 406 U.S. at 218 (holding that secondary schooling substantially interferes with the Amish religion because it "contravenes the basic religious tenets and practices of the Amish faith, both as to the parent and the child").

In contrast, courts have found that a government practice that offends religious sensibilities but does not force the claimant to act contrary to her beliefs does not constitute a substantial burden. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008). "A burden is not substantial if 'it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.'" *Sossamon*, 560 F.3d at 332. Moreover, "[a]n inconsequential or *de minimis* burden on religious practice does not [constitute a substantial burden], nor does a burden on activity unimportant to the adherent's religious scheme." *Kaemmerling*, 553 F.3d at 678; *see also Midrash Sephardi, Inc.*, 366 F.3d at 1227; *Abdullah*, 600 F.3d at 1321 (recognizing that not every "presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise"); *Ford*, 352 F.3d at 593–94 (focusing on appellant's subjective belief that the exercise at issue was "critical to his observance as a practicing Muslim" in evaluating substantial burden).

Appellant has failed to establish that the orders to remove the signs substantially burdened her religious beliefs. While Appellant seeks to cast the substantial burden as caused by the choice between obeying the orders to remove the signs and potentially facing a court-martial, this logic is flawed, as it presumes that taking down the signs constitutes a substantial burden — a burden imposing both secular and religious costs. This is the very legal question to be decided. We reject the argument that every interference with a religiously motivated act constitutes a substantial burden on the exercise of religion. *See Kaemmerling*, 553 F.3d at 679 (finding "as true the factual allegations that [the claimant's] beliefs are sincere and of a religious nature — but not the legal conclusion, cast as a factual allegation, that [their] religious exercise is substantially burdened").

In this case, Appellant did not present any testimony that the signs were important to her exercise of religion, or

that removing the signs would either prevent her "'from engaging in conduct [her] religion requires,'" *Mahoney*, 642 F.3d at 1121 (citation omitted), or cause her to "abandon[] one of the precepts of her religion," *Sherbert*, 374 U.S. at 404. While Appellant testified that posting the signs was religiously motivated in part, she did not testify that she believed it is any tenet or practice of her faith to display signs at work. *See Wilson v. James*, 139 F. Supp. 3d 410, 424–25 (D.D.C. 2015). Nor does Appellant's testimony indicate how complying with the order to remove the signs pressured her to either change or abandon her beliefs or forced her to act contrary to her religious beliefs. *See Kaemmerling*, 553 F.3d at 678–79; *cf. Hankins*, 441 F.3d at 104 (detailing the consequences of failing to assert or establish at trial that an action substantially burdens a religious exercise). Although Appellant did not have to provide evidence that posting signs in her shared workspace was central to her belief system, she did have to provide evidence indicating an honest belief that "the practice [was] important to [her] free exercise of religion." *See Sossamon,* 560 F.3d at 332. Contrary to Appellant's assertions before this Court, the trial evidence does not even begin to establish how the orders to take down the signs interfered with any precept of her religion let alone forced her to choose between a practice or principle important to her faith and disciplinary action.

"[C]ourts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *See Cutter*, 544 U.S. at 720. In evaluating whether taking down the signs constituted a substantial burden on her exercise of religion, we will not ignore two additional salient facts. First, Appellant never told the person who ordered her to take down the signs — which were not, like the wearing of a hijab, obviously religious to most, *see E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 n.3 (2015) — that they even had a religious connotation, let alone that they were important to her religion. Requiring that minimal step before concluding that an order imposes a substantial burden is certainly not onerous or unreasonable in the military context where orders are presumed to be lawful, adherence to orders is integral to the military performing its mission, and the military force is made up of diverse individuals with diverse backgrounds — with no guarantee those charged with command have any special expertise in religion. Permitting, as the dissent proposes, military members to disobey orders now and explain why later (much later, as in mid-trial in the instant case) makes no sense. It is certain

that "the military is, by necessity, a specialized society," *Parker v. Levy*, 417 U.S. 733, 743 (1974), and "to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps," *Goldman v. Weinberger,* 475 U.S. 503, 507 (1986). As we recently concluded:

> "[T]he military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history [and] are founded on unique military exigencies as powerful now as in the past." *United States v. Heyward*, 22 M.J. 35, 37 (C.M.A. 1968) (quoting *Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975)). Unlike his civilian counterparts, "it is [the servicemember's] primary business … to fight or be ready to fight wars should the occasion arise." [*Levy*, 417 U.S. at 744 (citation omitted)]. In order to achieve this objective, "[n]o question can be left open as to the right to command [by a superior], or the duty [to obey by a subordinate]." *In re Grimley*, 137 U.S. 147, 153 (1890); *accord* [*Goldman*, 475 U.S. at 507] (1986) (noting that "the military must foster instinctive obedience").

*United States v. Caldwell*, 75 M.J. 276, 281–82 (C.A.A.F. 2016) (alterations in original).

Second, and relatedly, we will not overlook the reality that DoD and Naval regulations permitted Appellant to request an accommodation for any rule or regulation that she believed substantially burdened her religion, but required that she adhere to and follow orders while awaiting a determination on the matter. *See* DoDI 1300.17 para. 4(g); SECNAVINST 1730.8B CH-1 para. 5(a). Appellant is charged with knowledge of both general orders, and not only did she fail to inform her superiors about the religious significance of the signs from her perspective, she did not request an accommodation.

We recognize that RFRA does not itself contain an exhaustion requirement and that at least one federal appellate court has held that an individual need not request an exemption to invoke RFRA, even if a system for doing so is in place. *See Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012). But we agree with those courts that have held that an option to request an accommodation "may eliminate burdens on religious exercise or reduce those burdens to *de minimis* acts of administrative

compliance that are not substantial for RFRA purposes." *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151, 1178 (10th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (per curiam); *Priests for Life v. U.S. Dep't of Health and Human Serv.*, 772 F.3d 229, 249–52 (D.C. Cir. 2014), *vacated and remanded sub nom. Zubik*, 136 S. Ct. 1557.

Appellant could have requested an exemption from her chain of command to post the signs, and she could have appealed a denial of the request to the Commandant of the Marine Corps. *See* SECNAVINST 1730.8B CH-1 paras. 5.c, 5.d. The relevant instruction requires commanders to balance requests against considerations such as military readiness and unit cohesion, and commanders must reply to requests within one week. *Id.* at paras. 5, 5.c. If military necessity precludes honoring a request, commanders are required to "seek reasonable alternatives." *Id.* at para. 11.d.

While Appellant's failure to seek an exemption does not prevent her from invoking RFRA, the accommodation process is important for two reasons. First, the established and expeditious option to request an accommodation illustrates the importance that the military places both on respecting the religious beliefs of its members and avoiding substantial burdens on religion where possible. Second, by potentially delaying an accommodation for only a short period of time, the accommodation process interposes a de minimis ministerial act, reducing any substantial burden otherwise threatened by an order or regulation of general applicability, while permitting the military mission to continue in the interim. This consideration is crucial in the military context, as the very lifeblood of the military is the chain of command. *United States v. Priest*, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972) ("The armed forces depend on a command structure that at times must commit men [and women] to combat, not only hazarding their lives but ultimately involving the security of the Nation itself."); *see also Caldwell*, 75 M.J. at 282.

Because Appellant has not established a prima facie case, this Court need not evaluate whether the orders at issue in this case were the least restrictive means of furthering a compelling government interest.

## IV. JUDGMENT

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

Judge OHLSON, dissenting.

In my view, the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb–2000bb-4 (2012), provides the men and women of our nation's armed forces with the presumptive right to fully, openly, and spontaneously engage in religious exercise. This right extends to sincere religious conduct that is not specifically required by, or deemed by judges to be important to, the tenets of a servicemember's faith. Further, servicemembers who are court-martialed for sincere religious conduct may invoke the protections afforded by RFRA even if they did not obtain the permission of the Government before engaging in that conduct, and even if they did not contemporaneously inform their chain-of-command that their actions were religious in nature.

I conclude that the majority's disposition of the instant case is not consistent with these rights under RFRA. Moreover, I conclude that the majority's analysis of the underlying legal issue raises the prospect that other servicemembers in the future may be subjected to conviction at court-martial for merely engaging in religious exercise that is entitled to protection under the statute. Therefore, I must respectfully dissent.

## I. Overview

To be clear at the outset, RFRA does not give members of the military carte blanche to do whatever they please, whenever they please, simply because they cloak their actions in the garb of religion. To the contrary, the preservation of good order and discipline in the military often serves as a legitimate and powerful governmental interest, and in appropriate instances, the interests of the individual must yield to the interests of the whole. However, the mere talismanic invocation of "good order and discipline" must not be allowed to curtail the religious liberty of our nation's servicemembers when the government's actions are neither warranted nor statutorily authorized.

In the instant case, Lance Corporal (LCpl) Sterling testified at trial that she posted in her workspace three strips of paper that contained a paraphrase of a biblical

passage.[1] She made clear that she did so because the signs were religious in nature, were evocative of the Trinity, and were intended to provide her with encouragement and comfort in a time of personal difficulty. In response to her conduct, LCpl Sterling's noncommissioned officer (NCO) ordered her to take down the signs, and when the junior Marine declined to do so, the NCO removed the signs herself. LCpl Sterling was then court-martialed for, inter alia, disobeying the NCO's order.

Under these circumstances, LCpl Sterling was entitled to have the United States Navy-Marine Corps Court of Criminal Appeals (CCA) analyze her conviction under the legal construct set forth in RFRA by Congress.[2] However, as both the Government and the majority concede, the CCA applied a fundamentally flawed definition of what constitutes religious conduct under RFRA. The CCA's decision thus deprived LCpl Sterling of a properly conducted review of her case under Article 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866 (2012), which states that a CCA may affirm "only such findings of guilt … as it finds correct in law and fact." The majority's decision to affirm this case on other grounds only serves to compound this problem.

I readily concede that even if the CCA had applied the correct legal standard in this case, LCpl Sterling may not have prevailed on the merits. It is not enough for a servicemember to engage in activity with religious underpinnings; the servicemember's actions must be a "sincere" expression of religious belief. Therefore, if a servicemember seeks to use less-than-genuine religious beliefs as a pretext for inappropriate conduct, or even if a

---

[1] The printed phrase was: "No weapon formed against me shall prosper." This is a paraphrase of the biblical passage stating, "No weapon that is formed against thee shall prosper." *Isaiah* 54:17 (King James).

[2] The majority devotes significant attention to the numerous leadership challenges presented by Appellant. However, RFRA does not predicate its applicability on the obedience, punctuality, demeanor, or performance of the person engaging in religious exercise.

servicemember is sincerely religious but has mixed motives for acting upon those beliefs—such as invoking a biblical passage in order to engage in a passive-aggressive display of contempt for military leadership—the servicemember's conduct will not pass muster under RFRA. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2774 n.28 (2014) ("[P]retextual assertion[s] of … religious belief[s] … fail [under RFRA]."); *see also United States v. Quaintance*, 608 F.3d 717, 722 (10th Cir. 2010) (rejecting RFRA defense due to an ulterior, secular motive). Indeed, there is evidence in the record to suggest that the latter scenario may be precisely what we are confronted with in the instant case. Importantly, however, as the majority also recognizes, the CCA failed to examine this fundamental question, and this Court does not have the statutory fact-finding authority to do so on its own.

Unfortunately, instead of remanding this case so that it can be properly adjudicated by the court below, the majority instead has chosen to impose a stringent, judicially made legal standard in this and future religious liberty cases that is not supported by the provisions of RFRA. Contrary to the majority's holding, the plain language of the statute does not empower judges to curtail various manifestations of sincere religious belief simply by arbitrarily deciding that a certain act was not "important" to the believer's exercise of religion. Neither does the statute empower judges to require a believer to ask of the government, "Mother, may I?" before engaging in sincere religious conduct. And further, nowhere in the statute are servicemembers required to inform the government of the religious nature of their conduct at the time they engage in it. In sum, the majority opinion imposes a legal regime that conflicts with the provisions of RFRA, contradicts the intent of Congress, and impermissibly chills the religious rights of our nation's servicemembers.

## II. The Law

As stated in the statute itself, RFRA prohibits the "Government [from] substantially burden[ing] a person's exercise of religion[,] even if the burden results from a rule of general applicability," unless the government can "demonstrate[] that application of the burden to the person—(1) is in furtherance of a compelling governmental

interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). As amended by its sister statute, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), RFRA covers "*any* [sincere] exercise of religion, *whether or not compelled by, or central to, a system of religious belief.*" 42 U.S.C. § 2000cc-5(7)(A) (emphasis added); *see also* 42 U.S.C. § 2000bb-2(4) (importing RLUIPA definition to RFRA); *Hobby Lobby*, 134 S. Ct. at 2774 n.28 ("To qualify for RFRA's protection, an asserted belief must be 'sincere' …."). This plain language provides a very broad aperture through which to view the type of religious conduct that is protected from governmental infringement. Indeed, RFRA guarantees Americans a degree of religious liberty that extends significantly beyond the rights afforded by the First Amendment. *See Holt v. Hobbs*, 135 S. Ct. 853, 859–60 (2015) (noting that "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment"); *see generally* 42 U.S.C. § 2000bb-(b).

As the majority acknowledges, there is no question that the protections afforded by RFRA apply with full effect to our nation's armed forces. RFRA explicitly states that it applies to the "government," which is then statutorily defined as including "a branch, department, agency, instrumentality, and official … of the United States." 42 U.S.C. § 2000bb-2(1). This certainly includes the military. *See, e.g., Singh v. Carter*, Civil Action No. 16-399 (BAH), 2016 U.S. Dist. LEXIS 26990, at *24–25, 2016 WL 837924, at *6 (D.D.C. Mar. 3, 2016); *Singh v. McHugh*, 109 F. Supp. 3d 72 (D.D.C. 2015); *Rigdon v. Perry*, 962 F. Supp. 150, 160 (D.D.C. 1997). Even if this fact were not sufficiently obvious on the statute's face, RFRA's legislative history would dispel any remaining doubt. Congress was crystalline in its expectation that RFRA would apply to the military. S. Rep. No. 103-111, at 12 (1993) ("Under the unitary standard set forth in [RFRA], courts will review the free exercise claims of military personnel under the compelling governmental interest test."); H.R. Rep. No. 103-88 (1993) ("Pursuant to [RFRA], the courts must review the claims of … military personnel under the compelling governmental interest

test."). It therefore is without question that the military falls squarely within RFRA's embrace.[3]

### III. How RFRA Generally Applies to the Military Justice System

RFRA's practical application in the military justice system is straightforward. When a convening authority refers charges against an accused based on activity that constitutes religious exercise, the accused may invoke RFRA to prevent prosecution and/or conviction.[4] *See* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of [RFRA] may assert that violation as a … defense in a judicial proceeding and obtain appropriate relief against a government."); *see also United States v. Christie*, Nos. 14-10233, 14-10234, 2016 U.S. App. LEXIS 10748, at *12, 2016 WL 3255072, at *4 (9th Cir. June 14, 2016) (stating that "RFRA gives each person a statutory right not to have his sincere religious exercise substantially burdened by the government"). In this context, a servicemember seeking the protections afforded by RFRA must initially demonstrate that he or she was engaging in, or seeking to engage in, religious exercise. 42 U.S.C. §

---

[3] This is further evidenced by Department of Defense, Instruction 1300.17, which addresses the "[a]ccommodation of [r]eligious [p]ractices [w]ithin the [m]ilitary" and explicitly incorporates RFRA. Dep't of Defense (DoD), Instr. 1300.17, Accommodation of Religious Practices Within the Military Services, para. 4.e.(1) (Feb. 10, 2009, Incorporating Change 1, Jan. 22, 2014) ("[R]equests for religious accommodation from a military policy, practice, or duty that substantially burdens a Service member's exercise of religion may be denied only when the military policy, practice, or duty: (a) Furthers a compelling governmental interest; [and] (b) Is the least restrictive means of furthering that compelling governmental interest.").

[4] The assertion by the Government that a servicemember must utter the mantra "Religious Freedom Restoration Act" at trial in order to be afforded the protections of that statute is utterly unfounded. Not only is "RFRA … the law regardless of whether parties mention it," *see Muslim v. Frame*, 897 F. Supp. 215, 216 (E.D. Pa. 1995), but LCpl Sterling unmistakably argued that the order was unlawful because of her religious beliefs. She even went as far as to submit the DoD Instruction that incorporates RFRA's framework.

2000bb-1(a). Religious exercise "involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Hobby Lobby*, 134 S. Ct. at 2769–70 (citation omitted). A servicemember does not need to prove that his or her conduct was either central to, or compelled by, his or her faith. *Id.* at 2770. Rather, a servicemember need only prove that his or her conduct was *sincerely inspired by* religion. *Id.* at 2774; *see also Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996) ("[S]crutiny [under RFRA] extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature. An inquiry any more intrusive would be inconsistent with our nation's fundamental commitment to individual religious freedom ....") (internal citation omitted); *United States v. Manneh*, 645 F. Supp. 2d 98, 111 (E.D.N.Y. 2008) (noting that the "[s]incerity analysis 'provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud'") (citation omitted).

A servicemember must next prove that his or her religious exercise was "substantially burden[ed]" by the government. 42 U.S.C. § 2000bb-1(a); *see also Hobby Lobby*, 134 S. Ct. at 2777–79. Although the statute does not define the term, "[i]t is well established that 'when [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (citation omitted). Here, we are faced with such a scenario. "Substantial" is traditionally defined as "[c]onsiderable in amount," *Black's Law Dictionary* 1656 (10th ed. 2014), and "burden" as "[s]omething that hinders or oppresses," *id.* at 236. It therefore is clear that a substantial burden exists where the government has *considerably* hindered or oppressed *any* sincere religious conduct. *See, e.g.*, *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034–35 (9th Cir. 2004) (using the dictionary definition of "substantial burden"). *Contra Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (using First Amendment precedent to

conclude that a substantial burden requires a compelled violation of beliefs).[5]

Finally, if a servicemember has successfully made this threshold showing—i.e., demonstrated both that he or she engaged in sincere religious conduct and that the government substantially burdened that religious exercise— the burden shifts from the servicemember to the government, which then must justify its actions. 42 U.S.C. § 2000bb-1(b); *see also Hobby Lobby*, 134 S. Ct. at 2779. To do so, the government must prove not only that it was seeking to achieve a compelling governmental interest when it burdened the servicemember's religious exercise, but that there existed no other, less burdensome means to protect that interest. 42 U.S.C. § 2000bb-1(b). This standard is "exceptionally demanding," *Hobby Lobby*, 134 S. Ct. at 2780, and requires a reviewing court to "look[] beyond [the government's] broadly formulated interests … and scrutinize[] the asserted harm … to particular religious claimants," *O Centro*, 126 S. Ct. at 1220.

Of course, this review entails special considerations in the military context. It goes without saying that the military's unique nature and mission give rise to the crucial interest of maintaining good order and discipline, an objective that is without analog in the civilian world. *See, e.g.*, *Brown v. Glines*, 444 U.S. 348, 354 (1980) (noting that the military has a "substantial Government interest" in maintaining "a respect for duty … discipline" (internal quotation marks omitted) (citation omitted)); *see also United States v. Caldwell*, 75 M.J. 276, 281–82 (C.A.A.F.

---

[5] As demonstrated by *Kaemmerling*, there is a distinct split among the federal circuit courts of appeals that have analyzed this prong of RFRA. The Supreme Court has yet to address this point, likely because the government typically concedes the existence of a substantial burden—even in cases where the challenged action does not compel an affirmative violation of a person's religious beliefs. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). *But see Priests For Life v. Dep't of Health & Human Servs.*, 772 F.3d 229, 244 (D.C. Cir. 2014), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (per curiam) (explicitly declining to answer this question).

2016) (emphasizing the same). To be clear then, the military's need to maintain good order and discipline may in certain circumstances trump an individual servicemember's presumptive right to engage in religious exercise.

But while the military's asserted interest in good order and discipline surely deserves great deference, it does not demand reflexive devotion. Rather, in each case an individualized determination must be made about whether the military's interest was compelling, and whether in realizing that interest, the military could have employed means that were less burdensome on the servicemember's religious liberties. And in so doing, attention must be paid to the fact that by enacting RFRA, "Congress … placed a thumb on the scale in favor of protecting religious exercise." *McHugh*, 109 F. Supp. 3d at 92.[6] The plain language of the statute mandates this approach, and it is not our role to question the lawfully enacted policies of Congress.

## IV. How RFRA Applies in This Specific Case

At trial, LCpl Sterling adequately demonstrated that the actions for which she was being court-martialed constituted

---

[6] When analyzing RFRA cases, the language of the statute controls—even in the military. I acknowledge the majority's concern about potentially establishing a "disobey first, explain later" approach to religious liberty in the armed forces. However, under the provisions of RFRA as enacted by Congress, servicemembers who engage in religious exercise pursuant to their statutory rights are not, in fact, disobeying a lawful order. Therefore, in such instances the "disobey first, explain later" concept is inapt; the statutory scheme provided by Congress is more akin to "exercise first, defend later if necessary." Indeed, consistent with the statute's provisions as crafted by Congress, servicemembers are not constrained from asserting a RFRA defense at any point in the disciplinary process. The question of whether this is the best approach in the military is a legislative determination, not a judicial one. And finally, it is important to note that those servicemembers who do disobey a lawful order and then improperly seek the protection of RFRA at a later date can be treated by the military in the same manner as any other servicemember who disobeys a lawful order for nonreligious reasons—to include being convicted at court-martial.

"religious" conduct.[7] LCpl Sterling testified that both the substance and placement of her signs were inspired by her Christian faith. The slips of paper that LCpl Sterling placed on her workspace were organized in the form of the "trinity," an unmistakable Christian motif, and on them was printed a biblically inspired quotation: "No sword formed against me shall prosper." This, LCpl Sterling suggested at trial, was done because she is "a religious person" and therefore viewed the printouts as providing her with the "protection of three." Thus, there is no doubt that LCpl Sterling's conduct required further analysis under the provisions of RFRA. However, the CCA concluded otherwise.

In its decision, the CCA held: "[W]e believe the definition of a 'religious exercise' requires the practice [to] be 'part of a system of religious belief.'" *United States v. Sterling*, No. NMCCA 201400150, 2015 CCA LEXIS 65, at *14, 2015 WL 832587, at *5 (N-M. Ct. Crim. App. Feb. 26, 2015). The CCA then went on to "reject … [A]ppellant's invitation to define 'religious exercise' as any action subjectively believed by the appellant to be 'religious in nature.'" *Id.* The CCA was wholly mistaken.

It has long been recognized that courts are particularly ill equipped to govern what does or does not constitute "religion." *See Thomas*, 450 U.S. at 715 (noting that "the judicial process is singularly ill equipped to resolve … [intrafaith] differences [among followers of a particular creed]"); *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981) ("Judges are ill-equipped to examine the breadth and content of an avowed religion …."). Instead, as the Supreme Court recognized in the First Amendment context, the exclusive role of a reviewing court "is to decide whether the beliefs professed … are sincerely held and whether they are, in [a servicemember's] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185 (1965); *see also*

---

[7] This is not to say that LCpl Sterling proved she was engaging in "religious exercise." As explained above, in order for a RFRA claimant to prevail on this prong, he or she must demonstrate that the conduct was religiously inspired *and* that it was sincere. A mere showing that the servicemember engaged in conduct that had religious overtones is not sufficient.

*Manneh*, 645 F. Supp. 2d at 112 ("[W]hile courts may be poorly equipped to determine what is religious, they are seasoned appraisers of the 'motivations' of parties and have a duty [under RFRA] to determine whether what is professed to be religion is being asserted in good faith."). It is therefore the case that "[i]mpulses prompted by dictates of conscience as well as those engendered by divine commands are … safeguarded against secular intervention, so long as the [servicemember] conceives of the beliefs as religious in nature." *Patrick v. LeFevre*, 745 F.2d 153, 158 (2d Cir. 1984); *accord Thomas*, 450 U.S. at 715 ("Courts should not undertake to dissect religious beliefs [of a] believer … [even if] his [or her] beliefs are not articulated with … clarity [or] precision …."); *see also Korte v. Sebelius*, 735 F.3d 654, 685 (7th Cir. 2013) ("[T]he judicial duty to decide substantial-burden questions under RFRA does not permit the court to resolve religious questions or decide whether the claimant's understanding of his faith is mistaken.").

As a result, the CCA's flawed understanding of RFRA prevented it from addressing whether LCpl Sterling's conduct was sincerely founded on her religious beliefs and, as a corollary, whether LCpl Sterling was engaged in "religious exercise"—the very first prong of RFRA. Such a determination must be built solidly on facts and, by statute, this fact-finding function lies solely in the unique province of the courts of criminal appeals; it does not lie within the purview of this Court. Thus, the proper disposition of this case is as clear as it is narrow. This Court should remand this case to the CCA so that it can properly consider the factual basis for LCpl Sterling's RFRA claim with a correct understanding of the law.[8] To this end, it is the CCA's prerogative to determine whether this is possible on the record or whether it is necessary to order a *DuBay*[9] hearing.

---

[8] To be clear, this conclusion in no way purports to suggest that LCpl Sterling should have or would have prevailed on the merits if the majority had ordered a remand. My position is based squarely on the fact that the CCA's obvious legal error deprived LCpl Sterling of an appropriate legal and factual review of her case.

[9] *See generally United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967).

Either way, the CCA should correctly consider the issues presented in this case. LCpl Sterling deserves no less, and we should seek to address nothing more.[10]

## V. The Majority's Substantial Burden Analysis Cannot Be Reconciled with RFRA

I disagree with four aspects of the majority's substantial burden analysis. First, the majority creates a requirement that the religious conduct must be "important" to the servicemember's faith in order to merit protection under RFRA. This directly contradicts the routine recognition that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989); *see also Sample v. Lappin*, 424 F. Supp. 2d 187, 193 (D.D.C. 2006) (noting the same in its RFRA analysis). In fact, the statute explicitly states that religious exercise *does not* have to be compelled by or central to a system of religious belief. *See* 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). Thus, the apparent assertion that religious conduct must be "important" to the servicemember's faith in order to merit protection under RFRA is mistaken.

Second, the majority's approach creates a novel notice requirement. But nowhere in RFRA's text, its legislative history, or the relevant case law does there appear any indication that the government must be conscious (or even sensitive to the possibility) that its actions may impermissibly curtail religious exercise in order for a successful RFRA defense to lie. *Cf. Lappin*, 424 F. Supp. 2d at 193 (noting that "[w]hether plaintiff declared his Jewish faith at the time of his incarceration is of no moment [to

---

**10** Any consideration of Appellant's claim, even after a proper RFRA analysis, would be incomplete without answering a question of fact that has not yet been considered, let alone addressed, by either the military judge or the CCA: Was LCpl Sterling's conduct sincere? This question lies beyond the proper scope of our authority, and because the answer is essential to the proper resolution of this case, we have but one option: Remand. *Cf. United States v. Edwards*, 46 M.J. 41, 46 (C.A.A.F. 1997) (remanding case for further proceedings where relevant facts were not developed to resolve legal issue).

whether his religious conviction was sincere]"). Indeed, RFRA was in many ways designed to apply where the First Amendment could not—that is, in the face of generalized, *un*intentional religious encumbrance. *See generally* 42 U.S.C. § 2000bb(a)(2) ("[L]aws [that are] 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise."); *Holt*, 135 S. Ct. at 859–60 ("Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment.").

Third, the majority mistakenly follows the Government's lead and considers LCpl Sterling's failure to avail herself of the Navy's accommodation framework. In the instant case, however, the Navy's accommodation regime is irrelevant. LCpl Sterling is challenging her NCO's order to remove her religiously inspired signs; she is not challenging the general provisions of the Navy's accommodation framework, nor is she challenging how that framework was applied in her specific case. Under such circumstances, if a servicemember demonstrates that he or she has met the first prong of RFRA, the focus must then be placed squarely on the scope, nature, and effect of the burden placed by the government on the servicemember's religious exercise—not on whether the servicemember *could have* sought "permission" from the government before engaging in the religious exercise.[11]

---

[11] The majority is correct that "an option to request an accommodation" can, in some cases, be relevant to a court's analysis under RFRA. *United States v. Sterling*, __ M.J. __, __ (19–20) (C.A.A.F. 2016). For example, the presence and nature of an accommodation mechanism would be appropriately considered in a case involving a challenge to a regulatory framework writ large. *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2782; *see also Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1178 (10th Cir. 2015) (addressing whether an accommodation framework itself creates a substantial burden), *vacated and remanded sub nom. Zubik*, 136 S. Ct. 1557. Here, however, we are not faced with such a scenario, and the focus exclusively belongs on the NCO's order. *See, e.g.*, *Singh*, 2016 U.S. Dist. LEXIS 26990, at *27–37, 2016 WL 837924, at *9–11 (holding that a military order to undergo testing was violative of RFRA even though the order was issued to allow the Army to determine whether to grant a religious accommodation to a Sikh officer). Whether LCpl Sterling *could*

Fourth, and finally, the majority takes the position that the Supreme Court's historical understanding of the term "substantial burden"—specifically, in the First Amendment context—makes clear that a claimed burden must be based on an affirmative violation of one's religion in order to qualify as "substantial." Thus, in the majority's view, because Appellant neither indicated that her religion requires her to post signs nor claimed that her religion prevents her from removing those signs, Appellant's conduct lies beyond the ambit of RFRA's embrace. But this approach unjustifiably narrows RFRA's substantial burden requirement.

Even if Congress implicitly sought to codify the understanding of "substantial burden" that was woven into the Supreme Court's First Amendment case law, nothing in that precedent indicates that a governmentally urged violation of one's religious beliefs is the exclusive means for effecting a substantial burden. *See, e.g.*, *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003) (Sotomayor, J.) ("Whether a particular practice is religiously mandated is surely relevant to resolving whether a particular burden is substantial. [But] the Supreme Court … [has never] held that a burdened practice must be mandated in order to sustain a … free exercise claim.… To confine … protection … to only those religious practices that are mandatory would necessarily lead us down the unnavigable road of attempting to resolve intra-faith disputes over religious law and doctrine.… We therefore decline to adopt a definition of substantial burden that would require claimants to show that they either have been prevented from doing something their religion says they must, or compelled to do something their religion forbids." (citations omitted)); *see generally* *Thomas*, 450 U.S. at 715. That is to say, a compelled violation of one's religion may be *sufficient* for finding a substantial burden, but this does not also mean that it is *necessary* for such a finding. Therefore, I cannot adopt the

_____

*have* sought permission for her conduct is therefore irrelevant to the legality of her NCO's order to remove LCpl Sterling's religiously inspired signs. To hold otherwise would subvert the very purpose of RFRA.

majority's unduly narrow definition of the term and believe it to be inconsistent with both the plain language and clear purpose of RFRA.

## VI. Conclusion

The majority opinion ventures beyond that which is necessary to decide the issue before us. In the course of doing so, the Court not only fails to ensure the proper application of RFRA to LCpl Sterling's specific case, it more generally imposes a legal framework that unnecessarily curtails the religious freedom of our nation's servicemembers. For this reason, I must respectfully dissent.